# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ASHLEY LAKE, )
Plaintiff, )
)
VS. ) CASE NO. 4:25-cv-00996-ALM
)
TAYLOR MORRISON, INC., )
Defendant. )

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL, VIDEOTAPED AND VIDEO CONFERENCE DEPOSITION
OF
ASHLEY LAKE
August 10, 2026
(Reported Remotely)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ANSWERS AND DEPOSITION OF ASHLEY LAKE, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 10th day of August, A.D., 2026, beginning at 9:44 a.m., before Carrie del Angel, a Certified Shorthand Reporter in and for the State of Texas, in the offices of Ogletree, Deakins, Nash, Smoak & Stewart P.C., located at 8117 Preston Road, Suite 500, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

APPEARANCES

FOR THE PLAINTIFF:
MR. JUSTIN V. SUMNER
MS. AMANDA BRIDSON
Sumner Law, LLP
3006 Cole Avenue
Dallas, Texas 75204
214.965.9229
jsumner@sumnerlaw.com
abridson@sumnerlaw.com

FOR THE DEFENDANT:
MS. ERIKA L. LEONARD
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
301 Congress Avenue, Suite 1150
Austin, Texas 78701
512.344.4700
512.344.4701 FAX
erika.leonard@ogletree.com

ALSO PRESENT: Alexis Frank - Videographer
Phillip Cook
Esther Kim (via Zoom)
Daisy Ramirez (via Zoom)



INDEX

Exhibit List....................................Page 4
Agreements......................................Page 1
Examination by Ms. Leonard......................Page 6
Corrections and Signature.......................Page 179
Reporter's Certificate..........................Page 181



EXHIBIT LIST


| No. | Description | Page Marked | Page Ident. |
|---|---|---|---|
| 1 | Defendant's Notice of Deposition of Plaintiff | 6 | 10 |
| 2 | Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories | 10 | 10 |
| 3 | String of emails beginning with an August 4, 2026 email to Justin Sumner, et al. from Ashley Lake | 26 | 26 |
| 4 | Resume | 29 | 29 |
| 5 | Taylor Morrison Team Member Handbook | 48 | 48 |
| 6 | 2025 Gift Review for Team Members | 64 | 64 |
| 7 | Base Pay Changes (Last 3 Years) | 74 | 74 |
| 8 | January 30, 2025 email from Stuart Meadows | 76 | 76 |
| 9 | 60-Day Performance Improvement Plan | 78 | 78 |
| 10 | String of emails beginning with a March 24, 2025 email from Ashley Lake | 80 | 80 |
| 11 | 30-Day Performance Improvement Plan | 81 | 81 |
| 12 | May 8, 2025 email from Phillip Cook | 84 | 84 |
| 13 | 2025 Goal Setting | 88 | 88 |
| 14 | Time off Requests | 88 | 88 |
| 15 | Standards of Behavior | 89 | 89 |





| No. | Description | Page Marked | Page Ident. |
|---|---|---|---|
| 16 | Charge of Discrimination | 105 | 105 |
| 17 | Photograph | 110 | 110 |
| 18 | Photograph | 113 | 113 |
| 19 | Plaintiff's Original Complaint | 115 | 115 |
| 20 | String of emails beginning with a June 3, 2025 email from Ashley Lake | 148 | 148 |
| 21 | Plaintiff's FRCP(a)(1) Initial Disclosures | 171 | 171 |
| 22 | Plaintiff's Objections and Responses to Defendant's First Requests for Production to Plaintiff | 172 | 172 |
| 23 | 2025 W-2 | 174 | 174 |
| 24 | 2024 W-2 | 174 | 174 |

A. No.
Q. Did you meet with your attorneys to prepare?
A. Oh, yes.
Q. Okay. And I'm not going to ask you about anything that you discussed with them or they discussed with you.
When did you meet with them?
A. Friday.
Q. Okay. About how long did you meet with them?
A. An hour. Maybe an hour and a half.
Q. And other than your interrogatory responses, did you review any other documents either with them or on your own to prepare for your deposition?
A. I reviewed the stuff that Taylor Morrison sent over; emails, my PIP information, that sort of thing, the interviews, I guess.
Q. Anything else you specifically recall looking at?
A. No.
Q. Did you review any documents to prepare for your deposition that had not been produced in this lawsuit either by you and your attorneys or by Taylor Morrison and their attorneys?
A. No.
Q. Did you speak to anyone other than your lawyers to prepare for this deposition?



A. No.
Q. Have you had any discussions with any current or former Taylor Morrison employees since the time you left Taylor Morrison about your lawsuit?
A. No.
Q. Haven't you spoken with Stuart Meadows about your lawsuit since the time you left?
A. I've just had him speak to my attorney. I didn't speak to him about the lawsuit.
Q. Did you reach out to him to ask him to speak to your attorney?
A. Yes.
Q. Why did you do that?
A. Because he witnessed a lot of the things that happened.
Q. When did you reach out to him to ask him to speak to your attorney?
A. I don't remember the exact date. I know it was sometime last summer.
Q. And what did he say when you asked him to speak with your attorney?
A. He said that he would.
Q. Have you also spoken with Barrett Gilbert about the claims in your lawsuit since the time you left Taylor Morrison?



A. Yes.
Q. And what did you discuss with Barrett?
A. Not necessarily the lawsuit, but I asked him if -- if he did have any information that may help, if he would speak to my attorney.
Q. Okay. And did he speak with your attorney?
A. I think.
Q. Okay. To the best of your knowledge?
A. I think so.
Q. And what was Barrett's position with Taylor Morrison?
A. Superintendent.
Q. Was he a peer of yours or a manager?
A. Just a peer.
Q. And what information did you think that he had that would be relevant to your lawsuit?
A. I wasn't sure. I just did -- I didn't know if he knew anything or if he had heard anything.
Q. Out of all the Taylor Morrison employees that worked at the same site as you, why did you pick him to reach out to?
A. Because Wes and Phillip are best friends. Why would I pick him?
Q. Are those the only people that worked on that construction site were Barrett and Wes and Phillip?



A. Barrett didn't work on the site.
Q. Okay.
A. Wes is the only other one who did.
Q. Where did Barrett work?
A. Anna or Melissa, I think. I'm not sure.
Q. And why did you think he would have information about what was happening at your site, then?
A. Because I heard that he heard some rumors about me specifically immediately after I left.
Q. And who told you that Barrett had heard some rumors about you?
A. Stuart.
Q. When did you have a conversation with Stuart about this?
A. Shortly after I left.
Q. How did that come up? Did he call you or text you to let you know?
A. He called me.
Q. Okay. And what was the rumor that Stuart told you that Barrett had heard?
A. That Stuart and I are having an affair.
Q. And was that true?
A. No.
Q. Has that been true at any point that you've known Stuart?

Page 42

A. A few months.
Q. What property were you working on?
A. I was in Denton.
Q. And you started employment with Taylor Morrison in February -- February 12th, 2024, correct?
A. Yes.
Q. And how long did you work in Denton?
A. A few months. I don't remember the exact month that they moved me.
Q. Do you remember if it was spring versus summer?
A. I think it was summer. Maybe early summer.
Q. And where'd you move to from Denton?
A. Celina.
Q. Who did you report to in Celina?
A. I think it was Stuart initially.
Q. How was Darren as a manager or supervisor?
A. He was good. He was nice. He seemed like he needed a lot of help, and I helped him a lot.
Q. Were you doing anything different in your role in Denton than what you ended up doing in Celina?
A. I was helping with the amenities and stuff a lot more in Denton. I was helping Darren a lot more.
Q. When you say "helping with the amenities," what do you mean?
A. The manager, I guess, of like whatever community

Page 43

it is -- it's their responsibility to build the amenities center. And he just kind of seemed lost and needed a lot of help with it. He would have me walk the frame with him and different things and ask for like my opinion on things and what he should do. He -- he just seemed like he needed help. So I helped him as much as I could.
Q. But you were working in Denton more on building the amenities center than building individual ones?
A. No, I was still building my units.
Q. Okay. Did you think Darren was fair as a manager?
A. Yes.
Q. Did you feel comfortable asking him questions?
A. Yes.
Q. We've been going about an hour. Are you okay? Do you want to take a break?
A. I'm okay.
Q. Okay.
A. I'm okay.
MS. LEONARD: Justin?
MR. SUMNER: I'm okay.
MS. LEONARD: You're good?
MR. SUMNER: You good?
MS. BRIDSON: Yeah, I'm good.
MR. SUMNER: Okay. All right.

Page 44

Q. (BY MS. LEONARD) How did it come to be that you moved from the Denton location to Celina?
A. I believe they hired a new guy who lived closer. I'm not sure why they decided to move me, but I think that was their reasoning.
Q. So maybe lived closer to Denton?
A. Yes.
Q. So is it fair to say sometime in the summer of 2024, you started reporting to Stuart?
A. Yes.
Q. How was Stuart as a manager?
A. He was good.
Q. How so?
A. He helped me a lot. I got ignored when I asked questions -- if I asked for order forms or trade contacts or just general information, I would get ignored by Phillip, so I would have to go to Stuart for a lot of things. So he was very helpful with -- with that.
Q. When you asked Stuart for help or guidance, did he give it to you?
A. He would ask me why I didn't go to Phillip. And I would tell him that I did go to Phillip multiple times, and he either walks out of the trailer or ignores my texts or my requests, and so then he would help me. And he told me he would talk to Phillip, but nothing really ever

Page 45

changed.
Q. Stuart was the manager over both you and Phillip, correct?
A. Yes.
Q. Did you feel comfortable going to Stuart when you had questions or concerns?
A. Yes.
Q. Did you think that Stuart had your best interests in mind in the workplace?
A. Yes.
Q. Did you think that Stuart genuinely wanted you to succeed in your role?
A. Yes.
Q. Do you think that Stuart ever discriminated against you in any way?
A. No. I mean, probably. I don't -- I don't know. Not -- I don't know.
Q. Do you have any reason to believe that he did?
A. No.
Q. Do you feel that Stuart harassed you in any way?
A. Not -- I mean, he joked around, but he knew when to keep it professional and everything.
Q. Did Stuart ever say anything that you found offensive?
A. No.

Page 94

woman, things along those lines.
Q. Okay. And who -- who told you that -- that that was happening, that that was a rumor that was there?
A. Bruce mentioned it. Bruce Gammell. He actually heard it on several occasions, from what he told me back then. Phillip and Wes would be talking about me in front of multiple trades.
Q. And saying what exactly?
A. No one wants to work for a woman. She's a shit builder. No one wants to listen to her. She doesn't know what she's doing. She doesn't belong on a job site.
Q. Did you ever hear Phillip or Wes say those things about you?
A. Yes.
Q. And which of those things did you directly hear Phillip or Wes say?
A. All of them and more.
Q. Where did these conversations take place?
A. The ones I heard were in the trailer.
Q. And when did these occur?
A. I don't remember exact months, but I believe it -- I mean, like small comments had been made for a while. Like it was ongoing. It was consistent. And then it got worse and worse. And the comments went from once in a while to every time I saw them, every time I was in the

Page 95

trailer with them.
And it wasn't just those comments about a woman being on a job site, it was making jokes about my kids being Hispanic or I -- Phillip had made -- I mean, it was -- it was constant. It was every time he was around. I didn't even want to go into the trailer because of it.
If I cleared my throat, he would ask, "Hmm, what's his name?" If I had a stomach ache and I was getting something out of the medicine cabinet, he would ask me if I was pregnant or if I was on my period.
I remember one weekend I had been hanging out with my kids all weekend and I had mentioned that I was like tired, and he was like, "Ooh, who wore you out?" It was every time I was around them.
I -- my -- I had a boyfriend living with me. He moved out earlier in the year. And I remember a couple of times Phillip making comments that if I wanted a new man, I could just pick any Mexican off of our job site because I like big burritos in my mouth. We -- like comments like that were made so frequently, and they amped up like between, I would say, April and May, and they got really intense throughout the month of May to the point where I did not want to go into the trailer. I worked out of my car a lot.
If I saw him and Wes at the trailer, I would

Page 96

work out of my vehicle because I couldn't stand it. I would cry driving to work every day, because I knew what was coming when I got there. The treatment was so bad. I would literally cry on the phone with my sister every morning driving to work because of the way that I was being treated up there.
And I did bring it up to Phillip multiple times. I asked him multiple times to stop and to have Wes stop.
One day, Wes pulled me aside, and he apologized. It felt sincere. And he said that he was not going to say those things, and he's sorry. He was just picking up off of Phillip's behavior and thought it was cool and thought everybody was cool with it, but he said he would not do it anymore. The very next day, it went right back to it, so...
Q. I want to try and take those one at a time, because you said a lot of things there. We got to talk about all of them.
A. Okay.
Q. So let me start back at what my original question was, and I was asking about the comments that you started out with that were -- you said were about your work abilities. We'll -- we'll start there.
And so who -- to whom are they -- Phillip and

Page 97

Wes, who are you saying they were making these comments to?
A. To the trades on the job site.
Q. While you were present in the trailer?
A. No. They said those to the trades on the job sites. That's what I heard from trades. And then they also said all of those other things in the trailer when I was there --
Q. Okay.
A. -- to me -- or to each other about me.
Q. And I know you said you couldn't put an exact date on it, so let's see if we can try and hone in on when you're saying these things occurred.
Was this before or after Stuart had been terminated?
A. The comments -- some comments were made prior to Stuart leaving, and I told Stuart about it. And Stuart said he would talk to Phillip. Phillip apologized, said he would calm down on making the comments. And I think maybe it did a tiny bit until Stuart left, and then it just amped full back -- fully back up --
Q. Okay.
A. -- when Stuart left.
Q. And Wes was not there prior to --
A. No.

Page 98

Q. -- Stuart leaving, correct?
A. No.
Q. So to whom are you alleging that Phillip made these comments in the trailer before Wes was there?
A. That was when Wes was there.
Q. Okay.
A. He was making the comment -- he was having the conversations with Wes, but prior to that, when it was just us, he would make those comments to me directly.
Q. Okay. And you said that you reported this to Stuart at some point?
A. Yes.
Q. Can you pinpoint in time when that was? We know it was before Stuart was terminated in March of 2025. Close in time to that? Farther back in time?
A. Well, I mean, I -- I reported it to him several times. Maybe between January and March.
Q. Okay. Of 2025?
A. Yes.
Q. And what was Stuart's response -- first, can you be specific about exactly what you reported to him?
A. I reported to him -- of course I reported to him that Phillip was not helping me with anything I asked. He would just ignore me when I asked, that he -- that he was saying these comments, you know, to me in the trailer,

Page 99

making me uncomfortable. He thinks it's joking, but it's -- I -- I don't find it funny. I'm just trying to work. I told him all of that. He said he would talk to Phillip. And that was probably -- that was probably in January or February.
And then again in March, I told him nothing has changed really. Same stuff is going on. And now I like -- it makes it hard to do your job when you're dealing with that. And so he said he would talk to him again. And he told me that he did. And Phillip apologized actually, I want to say, twice before Stuart left because of Stuart talking to him.
Q. So your belief is that Stuart did talk to Phillip on the two occasions that you reported this to Stuart?
A. Yes.
Q. Okay. Which comments specifically, if you recall, did you report to Stuart?
A. There was -- there was so many comments that were made, it's hard to pinpoint exactly which ones. I can't tell you exactly which ones. I mean, it was -- it was so much.
Q. What did Phillip say to you when he apologized on these two occasions that you mentioned?
A. He said something along the lines of like, "I joke around a lot. I'm -- I -- I'm sorry if anything I've

Page 100

said has offended you. I'll keep it strictly professional going forward."
Q. And did the comments stop after that?
A. No.
Q. Did Phillip tell you at one point that he wanted you to be a Mighty Mouse and not a quiet mouse when you were dealing with the trades, that he felt you needed to speak up and find your voice with them?
A. Yes.
MR. SUMNER: Objection, form.
A. He also said he could draw a picture of a mouse on my desk instead of dick if that would help motivate me.
Q. (BY MS. LEONARD) Is that a direct quote?
A. That is a direct quote.
Q. When did he make that comment?
A. During our meeting. I want to say it was probably our last meeting that I had there with him, the last PIP meeting.
Q. So that would have been May 2025?
A. Yes.
Q. Did you report to anyone at Taylor Morrison that he had made that comment?
A. No.
Q. Why not?
A. They are -- everyone already knew what was going

Page 101

on. Phillip, Brian, Mitch, everybody knew. They're all friends. They're all buddies. Brian made me feel like he was completely disgusted by me when he even looked at me. They -- they had known what was going on for a while. And they all protected Phillip because they're friends. So I did not feel like I could go to anybody.
Q. When you say "they already knew what was going on," what -- what do you mean? Let's start -- let's take it one at a time.
So Brian -- what are you specifically saying that Brian Lux was aware of?
A. They -- Brian Lux was aware that my door had been removed. He was aware of the paint on the desks. He even -- it had been there for a few days maybe, and he even mentioned needing to spray paint over it before HR saw it.
He has been there when -- it would just be little comments. I don't remember exactly what they were, but he was there when the little comments were made here and there from Phillip to or about me. And it was, you know, always in joking form. So it was kind of just laughed off and not a big deal to them.
Q. How do you know that Brian perceived that the door was removed and not just open?
A. Because it was sitting behind the desk in the middle of the trailer.

Page 142

your lawyers generally draft the complaint, but you're responsible for ensuring that everything in the complaint is true and accurate, correct?
A. Yes.
Phillip had a part in -- in taking off my door and spray painting my desk --
Q. Okay.
A. -- so -- and he was the one who was causing all of the emotional stress and everything that I tolerated.
Q. Who was?
A. Phillip while I was there, so that is why Phillip is named, is because he is the one who essentially led to my termination. Because of the way Phillip specifically treated me, Stuart did not lead to my -- lead to it. It was Phillip.
Phillip made me feel the -- the way he did. He continued to harass me and treat me badly and do things to embarrass me. Stuart didn't. That's why Phillip is named.
Q. But you believe that Stuart was involved in the door being removed and the spray painting?
A. I don't know. I --
Q. Okay. Well, didn't you tell me that --
A. I --
Q. -- Stuart told you he was involved in the spray

Page 143

painting?
A. It was after -- it was way after the fact, like after this was already filed when I found out that Stuart was involved in it.
Q. Okay.
A. Because I did ask him after it happened, and he said that he didn't do it.
Q. In Paragraph 20 -- 22, you say among other things that Dana Danfiel -- I'm not sure if that's the correct spelling on her name -- but Dana -- in any event, that Dana observed the sexually explicit graffiti on your desk?
A. Yes.
Q. When did she see that?
A. Every time she was in our neighborhood. I don't know specific dates. You would have to look at when she came to do her quality walks. But she saw it every time she was out there.
Q. Well, you said it was only there for a couple of days, so --
A. Well, you could --
MR. SUMNER: Objection, form.
A. You could --
MR. SUMNER: You can answer.
A. You could visibly see what it was even after it was poorly spray painted over. So she saw that every time

Page 144

she came out. And it was very clear what it was even poorly spray painted over.
Q. (BY MS. LEONARD) So she saw it after it had been spray painted over?
A. Yes.
Q. Okay. In Paragraph 27, you say that Phillip repeatedly and falsely told you and others that you had a sexually transmitted disease?
A. Yes.
Q. What did Phillip say in that regard?
A. This -- it was a repeated comment saying things like I had herpes and stuff to me, to other trades, just -- I don't know. I don't know if he thought he was like joking when he was saying it. It wasn't a joke to me.
I mean, I think that's really disrespectful to say about somebody, but it was -- I mean, I can't pinpoint what day or what specific time he said it because it was -- it was several times.
Q. Did you report that to anyone at Taylor Morrison?
A. No.
Q. And you didn't put that in the EEOC charge either?
A. I guess I left that one out. It was all just kind of the harassment overall and the comments overall.
Q. In Paragraph 33, you say that: Defendant's

Page 145

subcontractors reported to plaintiff that Cook would make comments about plaintiff outside of her presence that were so bad they did not feel comfortable repeating them to her.
And by "subcontractors," you mean people who are not employees of Taylor Morrison?
A. Yes.
Q. And who specifically made the comments to you that are referenced in Paragraph 33 of your complaint?
A. Bruce.
Q. What's Bruce's last name?
A. Gammell.
Q. Gammell, okay. Anyone else?
A. He's the one who made that specific comment, but other -- other subcontractors have told me things that they'd heard from -- about -- or from Phillip and Wes talking about me.
Q. Not anything in addition to what we've already discussed today?
A. Nothing new. It's all the same stuff.
Q. Then you say in Paragraph 34 that: In early May 2025, plaintiff spoke with subcontractors with whom she worked about Cook's treatment of her, and they suggested that plaintiff report him to defendant.
And did you do that?

Page 162

you earned from rehabbing, remodeling, flipping homes since you left Taylor Morrison?

A. I sent everything over. I don't -- I don't know it off the top of my head.

Q. Okay.

A. But I know we have it.

Q. Okay.

A. I don't remember the number.

Q. And the estimate you had given in your interrogatories in April was $60,000 since June 3rd of 2025.

And that number would be higher now, correct?

A. Yes.

Q. Okay.

MS. LEONARD: Amanda and Justin, we're going to ask that y'all supplement or amend the interrogatory responses to reflect what was produced on Saturday to us, please.

MS. BRIDSON: Will do.

Q. (BY MS. LEONARD) Did you apply -- after you left Taylor Morrison, did you apply to work at Highland Homes?

A. I don't remember if I did or not. I don't think I would have, because I know that they had gone through like a mass layoff shortly after I was terminated. And then I think they went through another mass layoff shortly

Page 163

after that.

I may have just for fun, because I love Highland Homes, but I don't -- I don't recall -- I don't know why I would, because I knew they had just laid off a ton of people, so like it wouldn't make sense. If I did it, I probably just did it because I love Highland.

Q. You're eligible for rehire there, as far as you know?

A. Oh, yes.

Q. One of the applications that you made in May 2025 was for a restaurant manager position at the Hillstone Restaurant Group.

Do you have any experience as a restaurant manager?

A. No, I don't. I kind of went through a lot of back-and-forth with my own mental on this. Part of me didn't want to ever really go back to working for a construction company again because of the taste that Taylor Morrison had left in my mouth was so bad. I didn't ever want to work for a construction company again, so I seriously considered like getting out of it.

But it's all I've ever done, so I -- I don't want to let the way they treated me ruin the passion that I have for it. But I deeply considered getting out of construction altogether because of this.

Page 164

MS. LEONARD: I'll move to strike that as nonresponsive.

Q. (BY MS. LEONARD) Did you receive any income from unemployment benefits since you left Taylor Morrison?

A. No.

Q. Did you apply for unemployment benefits?

A. No.

Q. Did you -- why not?

A. I didn't know that I could. I don't -- I've never got unemployment before or attempted to. I don't really know anything about it, so it really didn't even cross my mind.

Q. Do you know if you're eligible for unemployment benefits if you resign your employment?

A. I was terminated, so I'm not sure how that works.

Q. My question is whether you know if you're eligible for unemployment benefits if you resign from employment.

A. I have no idea. I don't know anything unemployment.

Q. You're aware that Stuart Meadows provided your counsel with a sworn declaration for purposes of this lawsuit, correct?

A. Yes.

Q. Have you reviewed that?

Page 165

A. Yes.

Q. Did you review it -- the drafts of it before Stuart signed it?

A. I believe they sent me a copy after.

Q. Okay. Do you know for a fact that you did not review any drafts, or you don't recall?

A. I don't recall.

Q. Okay. Did you speak to Stuart or communicate with him in any way about the subpoena that he received to produce documents and have his deposition taken in this matter?

A. Yes.

Q. Okay. When did you have that conversation?

A. Probably the day he got the subpoena. I think he said they had tried a couple times, but maybe he wasn't home.

Q. Did he reach out to you about it, or you reached out to him?

A. He reached out to me.

Q. And what did you talk about with respect to the subpoena?

A. He read it to me, and I told him he should probably ask ChatGPT, because I don't know anything about any of that.

Q. Did you give him any advice or opinion on whether

Page 166

he should comply with it?
A. I told him to ask ChatGPT everything, because I don't know. I -- I told him I don't know if he has to or if he should. I don't -- I told him I just don't know anything about that. I said if he want -- I would ask -- I would ask ChatGPT, so that's what I told him to do.
Q. Did he talk to you about any objections to make to it, or did you talk to him about that?
A. I don't think so. I wouldn't even know to say those words.
Q. You agree that he's someone that has information that's relevant to the allegations that you're making against Taylor Morrison, correct?
A. Yes.
Q. Have you ever socialized with him outside of work either when you were at Highland Homes or at Taylor Morrison?
A. Yes.
Q. How many occasions, do you think?
A. Five.
Q. Okay.
A. I'd say between five and ten times. That ten would even be kind of pushing it probably.
Q. Okay. What was the nature of those instances?
A. We did like a lot of happy hour-type stuff at

Page 167

Highland Homes, so after work, we would all go together for a drink. I remember his last day, we all -- all of us went out and had drinks and ate. And like all of the bosses and everybody went for his last day there.
Then I didn't see him again for a couple of years, I guess, until Taylor Morrison. And then we just -- that was all just like after work grabbing drinks, or if we went to happy hour with a company, we would have -- we would see each other there. So I would consider that outside of work.
Maybe two or three times tops he would be in my area -- because we lived pretty far apart -- and if he was driving by -- driving through, he was going to stop in Plano to get a beer, he would call me, and I'd go and get a beer with him and go home, and he'd go home. But that was really the extent of it.
Q. How many times do you think you went to happy hours together at Highland Homes?
A. Not many, because he was only there for two weeks in that time, so I -- really, out there, I think we only went to like the bars and stuff one time specifically. All the other times that we would drink would be like at the trailer on like a Friday after work. And everybody would. So for Highland Homes, I'd probably say just once.
Q. And at Taylor Morrison, in addition to grabbing

Page 168

drinks after work, you're saying there were probably two to three times that you met, just the two of you, to have drinks near your house?
A. Yes.
Q. Any times that you've socialized with him since you left Taylor Morrison?
A. We went and had a beer once at Twin Peaks in Plano.
Q. When was that? Do you remember?
A. June last year.
Q. Is that before or after he was in contact with your attorneys?
A. That was before. That was like shortly after I was terminated. He was meeting somebody to talk about a job, and he was waiting for him to get there, so he was like, "Come up here and have a beer." And I went up there, and I had a couple of beers with him and probably a shot or two, and then went back home, and he met with the guy he was supposed to meet with.
Q. Do you know whether you're eligible for rehire at Taylor Morrison?
A. I would assume no.
Q. Do you --
A. I don't --
Q. -- have any reason to believe that?

Page 169

A. Just because of all this. I -- that would be my assumption, but I don't know.
Q. No one at Taylor Morrison's ever told you that you're not welcome back, correct?
A. No.
Q. And no one ever told you that you needed to resign your position and not continue to work there, right?
A. Well, Phillip did say a couple of times, like, "If you don't like it, then you should just quit," or just -- "If you don't like how you're treated, just leave." He did say that a couple of times, but aside from that, no.
Q. When did those conversations occur?
A. Probably in like April and May.
Q. Didn't you tell Phillip that you felt like maybe it was -- Yardley was too fast paced for you, and you might want to go back to single home construction?
A. I don't remember ever saying that.
Q. Are you testifying that you did not say that or that you can't recall?
A. I'm testifying that I can't recall.
Q. Okay. Have you ever met Stuart's wife or kids?
A. I've met his wife. I believe he brought his son up to the trailer maybe a couple of times. So I've met him there. But I met his wife at company events.

Q. Has he ever met your kids?
A. Yes.
Q. At work at the trailer or outside of work?
A. At work.
Q. Did you regularly go to lunch together when you both worked at Taylor Morrison?
A. When he was in my area, we would, which was maybe a couple of times a month. But we all would. It wasn't just like Stuart and I. Phillip was -- would go as well. And sometimes like the painter would go, sometimes, you know, different people would go.
Q. Was it kind of the culture there that people went out to lunch every day or almost every day?
A. Not every day. Like if -- if like a manager like Stuart was in the neighborhood, then yeah, or if Dana was in the neighborhood, yeah, I would say it's the culture that we go to lunch together.
But for day-to-day, a lot of times I would go to lunch by myself. Phillip would go to lunch by himself until Wes -- sometime -- every now and then, we might go to lunch together. But I think when Wes got there, he and Wes went to lunch together frequently, but they're friends outside of work, so it makes sense.
Q. Did you ever go to lunch with Phillip and Wes?
A. Yeah.



Q. How many times do you think?
A. Not a lot. Just a handful. I don't know how many. But not -- I didn't do it all the time. I -- yeah. I don't know.
(Exhibit No. 21 was marked.)
Q. (BY MS. LEONARD) I'm going to give you Defendant's Exhibit 21. Do you recognize this document marked Initial -- Plaintiff's FRCP 26(a)(1) Initial Disclosures?
A. Yes.
Q. Okay. Did you review these before they were submitted by your counsel?
A. Yes.
Q. Did you talk to Stuart about whether he was willing to participate in your case before he was listed on this document as a person with knowledge?
A. I don't know if I -- I don't think I had talked to him yet and asked him if he would -- if he would. I -- I just can't remember if it was before or after.
Q. But you have asked him whether he would participate in your case?
A. Yes.
Q. Okay. What did he say?
A. He said yes.
Q. On Page 3, under Roman numeral II, there's a list



of documents in your possession, custody or control that you might use to support your claims. And the first category is text messages between plaintiff and defendant -- plaintiff and defendant's employees. You've only produced, I think, a couple of text messages in this litigation.
Do you have more text messages with any current or former employees of Taylor Morrison?
A. I do not. I never had any text conversations with them. Like if you -- I don't -- who are you referring to specifically?
Q. Well, you have to tell me, because I don't know who you've been texting with, so --
A. Well, I mean, I haven't -- I haven't -- any text messages I had with Taylor Morrison employees was on the work phone about work. The only other person who I have their personal number is Stuart, and we never text about anything.
The only time we'll text is if like I need a contact for one of my jobs, or he needs a contact for one of his jobs, and we'll exchange contacts. But we -- we don't text about anything other than that. Usually conversations we had are on the phone.
Even if he's in the area or -- to get a beer or anything like that, it was always a phone call. It was



-- we never text.
Q. I'll show you Defendant's Exhibit 22.
(Exhibit No. 22 was marked.)
Q. (BY MS. LEONARD) Do you recognize these Objections and Responses to Defendant's First Request for Production of Documents?
A. I'm sorry. What was your question?
Q. Just if you recognize this document.
A. Yes.
Q. Okay. And do these reflect your responses to defendant requesting you for documents within this litigation?
A. Yes.
Q. Did you review these before they were served on defendant?
A. Yes.
Q. And let me ask you the same thing about Exhibit 2, if you don't mind just taking a peek back at that. It should be at the bottom of your stack.
A. This one?
Q. No, Exhibit 2.
A. Oh. Oh.
MR. SUMNER: Exhibit 2.
Q. (BY MS. LEONARD) I don't think I asked you this.
Did you review those written responses before

claims against Taylor Morrison that you've not shared with me today during this deposition?
A. No.
Q. Have you testified truthfully and accurately to the best of your ability?
A. Yes.
MS. LEONARD: Okay. I'll pass the witness.
MS. BRIDSON: Just take one minute to confer?
MR. SUMNER: Sure. Yeah. Just one minute. We can go off the record.
MS. LEONARD: Sure.
THE VIDEOGRAPHER: Off the record. The time is 3:57.
(Break was taken.)
THE VIDEOGRAPHER: Back on the record. The time 4:01.
MR. SUMNER: I have no questions of the witness at this time.
THE VIDEOGRAPHER: All right. Anything else on the record before I take us off?
This concludes the deposition. We are off the record at 4:01 p.m.
(End of Proceedings.)



ERRATA

WITNESS: ASHLEY LAKE DATE: AUGUST 10, 2026

PAGE NO./LINE NO. CHANGE REASON FOR CHANGE

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________



ACKNOWLEDGMENT OF DEPONENT

I,_________________, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted on the attached Errata.

______________________________

ASHLEY LAKE AUGUST 10, 2026



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ASHLEY LAKE, )
Plaintiff, )
)
VS. ) CASE NO. 4:25-cv-00996-ALM
)
TAYLOR MORRISON, INC., )
Defendant. )

*******************************************

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
ASHLEY LAKE
AUGUST 10, 2026

*******************************************

I, CARRIE DEL ANGEL, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ASHLEY LAKE, was duly sworn by me and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_XX__ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the

transcript. If returned, the attached Errata contain any changes and the reasons therefor;

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 12th day of August, 2026.

Carrie del Angel

CARRIE DEL ANGEL, TEXAS CSR #6036
Certification expires: 1/31/2028
Deposition Resources, Inc.
A Veritext Company
300 Throckmorton Street
Suite 1600
Fort Worth, Texas 76102
Firm Registration No. 571
817.336.3042