# EXHIBIT F

NO. 4:25-CV-00996-ALM

ASHLEY LAKE, )
)
Plaintiff )
)
VS. ) CIVIL ACTION NO:
) 4:25-cv-00996-alm
TAYLOR MORRISON, INC., )
)
Defendant )

--------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

PHILLIP COOK

August 13, 2026

Volume 1

--------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF PHILLIP COOK, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 13th day of August, 2026, from 9:31 a.m. to 4:09 p.m., via Zoom Video Conference, before Jeffrey Alan Payne, CSR in and for the State of Texas, reported by oral stenography, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. Justin V. Sumner
SUMNER LAW, LLP
6125 Luther Lane
Suite 122
Dallas, Texas 75225
PHONE: 214-965-9229
E-mail: JSumner@SumnerLaw.com

FOR THE DEFENDANT:
Ms. Erika L. Leonard
OLGETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
301 Congress Avenue
Suite 1150
Austin, Texas 78701
PHONE: 512-344-4700
E-mail: Erika.Leonard@Olgetree.com

ALSO PRESENT:
Mr. Sergio Saragoca - Videographer



INDEX


Appearances. . . . . . . . . . . . . . . . . . 2
Stipulations . . . . . . . . . . . . . . . . . 5
PHILLIP COOK
Examination by Mr. Justin V. Sumner. . . . 6
Examination by Ms. Erika L. Leonard. . . . 231
Re-Examination by Mr. Justin V. Sumner . . 234
Signature and Changes. . . . . . . . . . . . 237
Reporter's Certificate . . . . . . . . . . . 239

EXHIBITS PAGE
NO. DESCRIPTION
1 Declaration of Stuart Meadows. . . . . . . 23
2 Phillip Cook - Facebook Page . . . . . . . 33
3 Base Pay Changes - Walker & Lake . . . . . 39
4 Investigative Talking Points . . . . . . . 43
5 e-mail: Stuart Meadows to Ashley Lake. . . 54
6 e-mail: Brian Lux: Ashley Lake PIP . . . . 57
7 e-mail: Workday TaylorMorrison . . . . . . 59
8 60 Day Performance Plan: Lake, Ashley. . . 61
9 Ashley Lake Time Off Chart . . . . . . . . 71
10 e-mail: Ahsley Lake: PIP. . . . . . . . . 75
11 30 Day Performance Plan: Lake, Ashley. . . 93
12 e-mail: Workday TaylorMorrison. . . . . . 97
13 e-mail: Cook, Phillip: 30 PIP Review. . . 99
14 e-mail: Sumner, Justin: Notice of 111





15 e-mail: Lux Ashley Lake PIP Completion . . 112
16 e-mail: Ashley Soso: Ashley Lake PIP . . . 133
17 Follow Up Discussion: Russ to Cook . . . . 133
18 Active Training List: Phillip Cook . . . . 140
19 Photos: Ashley Lakes' Desk . . . . . . . . 150
20 Photos: Ashley Lakes' Desk . . . . . . . . 150
21 Taylor Morrison Team Member Handbook . . . 185

correct?
A. Yes, sir.
Q. Okay. And again, that's the first time you ever took this course?
A. Yes, sir.
Q. All right. If you could go back to Exhibit 1 for me. And would you please turn -- and this is the declaration of Stuart Meadows, correct?
A. Yes, sir.
Q. Okay. And if you could look at Number 18 for me on the second page. It says here, "It is my understanding Mr. Cook was placed on paid leave during an investigation into Ms. Lake's claims. After he was placed on leave, Mr. Cook called me on two occasions. Mr. Cook complained about being placed on leave, that Ms. Lake had asserted claims against him and stated he was trying" -- "he was, quote, trying to help, quote, Ms. Lake at work. This call left me with the impression that Mr. Cook was trying to control the narrative around his actions and get me on his, quote, side of the dispute." Do you see that? Did I read that correctly?
A. Yes, sir.
Q. Okay. Is it true that you called Mr. Meadows on two occasions complaining about being placed on leave?
A. Not entirely.
Q. Okay. Please elaborate.



A. I wasn't the first one that called.
Q. What does that mean?
A. That Stuart Meadows had reached out to me first. I was actually on the phone with Soso and trying to get things reorganized on getting transitioned back and learn why I was -- where we were at when he was calling. And I called him back after I learned that I was on suspension. Didn't even know why yet. I invented some frustration to him because he was still a friend at the time.
Q. So which -- which call with Soso were you on when he called?
A. The first one was that, are you available a little bit? We're going to have a meeting. She's going to get all the people together. After I talked with Mitch.
Q. Oh.
A. That morning.
Q. Okay.
A. Driving home.
Q. So that -- that would have been on -- on the -- on June 3rd?
A. Yes, sir.
Q. Okay. And so you were on the phone with Ms. Soso on June 3rd, and it's your testimony that Stuart Meadows called you at the same time?
A. Yes, sir.



Q. Okay. And what did he -- why was he calling you, do you recall?
A. He was like, hey, what are you doing? Like, I'm driving home right now. I was just told not to go to work. Why? I was like, I don't know. Sums up. I don't know any details. I was just told not to go home or go to work to go home. He expected a phone call in a little while.
Q. Okay. Was there -- did Mr. Meadows give you any reason he was calling you? Was he calling just to touch base?
A. Really about it. I was like, I got to go in case she calls. I can't talk long.
Q. Okay. And then you called him back later, correct?
A. Uh-huh.
Q. And what did you discuss with Mr. Meadows, if you recall?
A. Just to, hey, you know, sorry, I was short earlier. What's going on? You know, I'm on suspension now. I don't know what to do. I don't know full details and why, but I got some allegations against me. It just sucks because I really thought I was on Ashley's side. I was pushing for it to stay here and now --
Q. Mr. Meadows states I'm sorry, I didn't mean to interrupt you. Are you finished talking?
A. I said, now she's gone, so.
Q. And Mr. Meadows states that his impression was that



you were trying to -- trying to control the narrative around your actions to get him on your side of the dispute. Is that what you were trying to do?
A. Yes.
Q. Okay. Sorry, I'm [inaudible]. Let's go back and look at Exhibit 4. Please go to the page Bates labeled Taylor Morrison 000375. And here the interview states -- do you see your name, Phillip Cook, in the middle of the page?
A. Yes, sir.
Q. Okay. Here, the interview states, "I went through the allegations in the notice of representation, and Phillip provided the following responses"; is that correct?
A. Yes, sir.
Q. Okay. So at that point, you were aware of the -- the allegations contained in the note in the notice of representation that I sent -- e-mail I sent?
A. Not entirely because it was on a broad spectrum of -- as any employees at TM.
Q. Okay.
A. Comments like this? Have you made comments like this? I didn't know it was directly towards me.
Q. Okay. But you're just -- your understanding what at least per this note here, Ms. Russ went through the allegations in my notice of Representation, correct? That's what it says here?

Page 149

A. She never asked me -- she would have to.
Q. And you were present for Ms. Lake's deposition this past Monday, correct?
A. Yes, sir.
Q. And you recall she testified the images were spray painted over days later, correct?
A. Yes, sir.
Q. And you agree with that, no?
A. Yes, sir.
MR. SUMNER: Okay. All right. Do you guys want to take -- this -- this is kind of a good time for a quick break, five-minute break? Okay. All right. We'll go off the record.
THE REPORTER: Off the record at 2:02.
(A recess was taken.)
THE REPORTER: Back on the record at 2:14.
BY MR. SUMNER:
Q. Mr. Cook, we've just taken our afternoon break here. Are you refreshed and able and willing to provide further testimony for me today?
A. Yes, sir.
MR. SUMNER: Okay. I have just handed you two exhibits marked Exhibit 19 and Exhibit 20.
(Plaintiff's Exhibits 19-20 were marked for identification.)

Page 150

BY MR. SUMNER:
Q. Do you see that, sir?
A. Yes, sir.
Q. And I'll submit to you, Exhibit 19 are the sexually explicit spray painted photos of two penises and boobs on a desk. And Exhibit 20 appears to be those explicit drawings, spray painted over an orange paint. Do you see that? Do you agree with me?
MS. LEONARD: Object to form and characterization.
THE WITNESS: [Inaudible] what these are. Okay.
BY MR. SUMNER:
Q. Would you agree that the -- in Exhibit 19, that these are explicit images spray painted on a desk?
A. Yes.
Q. Okay. And would you agree with me that Exhibit 20, those explicit images appear to be spray painted over in orange spray paint?
A. Yes, sir. Okay.
Q. And this was Ms. -- just to establish, this was Ms. Lake's desk in the trailer, and you recognize it as it being her desk having worked with her in the trailer, correct?
A. Yes, sir.
Q. Okay. And did these images look like accurate photos of Ms. Lake's desk when they were spray painted?

Page 151

A. Yes, sir.
Q. Okay. And again, having reviewed these paintings, there are these -- these two exhibits, is it still your sworn testimony today under penalty of perjury, that you -- that you did not physically participate in any way by spray painting the explicit drawings on Ms. Lake's desk?
A. That is correct.
Q. Okay. And having reviewed these photos today, is it still your testimony that it -- sworn testimony that it was Mr. Meadows who did all of the -- the spray painting here in these photos?
A. Yes, sir.
Q. And it's still your sworn testimony today, having reviewed these -- these exhibits, that you never even picked up a can of orange spray paint and did not even touch up the explicit images after Mr. Meadows spray painted them?
A. Correct.
Q. Okay. So if you recall in Mr. Meadows declaration, which was Exhibit 1 to your deposition, at -- at Number 9, he states, "I, along with Phillip Cook, spray painted images of two penises and breasts on Ms. Lake's desk. Mr. Cook and I each used the can of spray paint to paint these images. He was an active participant in putting the images on Ms. Lake's desk and not a passive observer." Is it your position today and your testimony that Mr. Meadows just -- just flat out lied in

Page 152

his declaration --
A. Yes.
Q. -- about your participation? You did not participate and he was lying about it?
A. That is correct.
Q. Okay. And it was only you and -- and Mr. Meadows in the trailer at the time these Exhibit 19, the explicit images were spray painted on Ms. Lake's desk, correct?
A. Yes, sir.
Q. Okay. And again, having reviewed these photos here, is it true you actually watched Mr. Meadows spray paint the desk?
A. No.
Q. No? You didn't?
A. I didn't physically watch him do it. I was down in my other -- in my office, and then I could smell spray paint. I looked up and he was wrapping up.
Q. Okay. But you did see him spray painting on the desk when he was wrapping up?
A. Yeah. Yes, sir.
Q. Okay. Did you know he was going to spray paint before you did it?
A. No, sir.
Q. Did you tell him to stop?
A. I didn't get a chance to. He was -- had it done.

Q. Man, I think earlier you testified that -- that you laughed. If I'm recalling your -- your testimony, you said all three of us laughed.
A. Uh-huh.
Q. Do you recall that? Who is all three of us?
A. When Ashley came in.
Q. Okay.
A. Because we were all on our way back from lunch.
Q. Okay. What do you mean you were all -- you were in the trailer with Mr. Meadows, correct?
A. We all had come back from lunch. Me and Stuart came in first. Ashley went to check on some of her units. And so she was trailing behind. So it was probably five minutes, ten minutes for her to get back to the trailer. So I was in my office. Stuart was at his desk. I smell spray paint. He's wrapping up. About that time is when Ashley came in.
Q. Okay. And when she -- when you say she laughed, isn't it fair to say that sometimes when people view something that makes them uncomfortable or nervous, in your experience, an individual can laugh because they're uncomfortable?
A. Yes, sir.
Q. Okay. And do you think that's what happened here with Ms. Lake?
A. I don't know for sure.
Q. Okay. And do you know who owns the desk that Mr.



Meadows applied the paint to, Exhibit 19?
A. I'm sorry. Who owns it?
Q. Yes. Who owns the desk?
A. Taylor Morrison property.
Q. Okay. And so the -- the desk wasn't Stuart Meadows' personal property, correct?
A. That's correct.
Q. Okay. And to your knowledge, does Taylor Morrison have any policies concerning responsible use of Taylor Morrison property in their handbook? Do you recall?
A. I don't know.
Q. Okay. If I told you they did, that wouldn't surprise you, would it?
A. No, sir.
Q. Okay. Prior to the paint that you allege Stuart applied to Ashley's desk here in -- in this image -- these images in Exhibit 19, were you aware of Stuart having ever painted or drawn images of any kind on any other employee's desk?
A. Not with paint.
Q. Okay. What -- what else are you aware of him using?
A. He used peanut butter and jelly one time to draw circles and squiggles all over Barrett's desk.
Q. Do you remember when that was?
A. I -- I don't know, sir.



Q. Was that before these images were spray painted on Ms. Lake's desk?
A. Yes, sir.
Q. Okay. Do you remember approximately how long before?
A. I don't. I just remember seeing pictures of it.
Q. Okay.
A. They would joke between each other about.
Q. Okay. Did you report the incident of him putting peanut butter and jelly on that desk?
A. No, sir.
Q. Okay. Do you know whether he reported the incident, Mr. Meadows?
A. No, sir. I don't know.
Q. Whose desk was it again, you say?
A. Barrett Gilbert's.
Q. Barrett Gilbert. Do you know whether Mr. Barrett Gilbert reported that incident with the peanut butter and jelly?
A. I don't know.
Q. Okay.
A. Sorry.
Q. To your knowledge, prior to -- and I believe this was early October. This Exhibit 19 occurred in early October, approximately October 8. Does that sound about right to you? 2024.



MS. LEONARD: Object to form.
THE WITNESS: Maybe, I -- sounds accurate. I'm just bad at dates.
BY MR. SUMNER:
Q. Okay. Are you aware of Mr. Meadows ever painting or drawing images of any kind on any other employee's personal belongings, to your knowledge?
A. No, sir.
Q. Prior to these images being painted on Ms. Lake's desk, are you aware of Stuart having ever painted or drawn images of any kind on any other equipment or materials used by an employee for their work, Taylor Morrison?
A. Other than blank pages. Printer paper.
Q. Okay.
A. No.
Q. So you are aware of -- of inappropriate images being drawn by Mr. Meadows on blank pages or printer paper?
A. Yes, sir.
Q. Okay. What -- what -- explain. What -- what are you aware of?
A. He's drawn on the middle finger and thrown it into my office where I opened up. It looks like a middle finger. He's drawn penises before, so it was --
Q. For you? For you? To you, giving that --
A. Yeah. He was throwing while he was in the trailer

or threatened to remove Ashley's door?
A. That's correct.
Q. Okay. Do you recall about when in time Ms. Lake's door was removed from her office?
A. Rough estimate would be a month or so before the painting incident.
Q. Okay. And you state here, on Exhibit 4, the next sentence, "This was Stuart. He removed Ashley's door when we got back from lunch." Is that still -- is it your sworn testimony today that it was Stuart who removed her door and he removed the door after you and he got back from lunch?
A. After we all got back from lunch. Yes, sir.
Q. Okay.
A. All three of us.
Q. All three of you?
A. Yes, sir.
Q. Including Ms. Lake?
A. Yes, sir.
Q. So she was present when the door was removed?
A. Yes, sir.
Q. Okay. Do you think it was appropriate for her office door to be removed?
MS. LEONARD: Object to form.
BY MR. SUMNER:
Q. In your opinion?



A. It wasn't -- there -- there wasn't really any negative to the door removal. We're in a construction trailer, and we don't really use doors.
Q. Did you have a door in your office?
A. I did.
Q. Okay. And was it removed?
A. It was taped open.
Q. Taped open?
A. Yeah, double-sided tape stuck up against the door, so it wouldn't swing closed.
Q. Okay. But it wasn't removed, was it?
A. Correct.
Q. Okay. Do you recall using any hardware or tools to assist Mr. Meadows [phonetic] in removing Ms. Lake's door?
A. No, sir.
Q. Did you assist Mr. Meadows in carrying the door -- Ms. Lake's door, to the common area of the trailer?
A. No, sir.
Q. Did you touch the door at all during this process of removing Ms. Lake's door?
A. Yes.
Q. And what did you --
A. Because I was going to put it back on, and I was told not to.
Q. Who told you not to put it back?



A. Stuart Meadows, because she didn't deserve a door yet.
Q. Did he explain why she didn't deserve a door?
A. Because he was tired of her not answering when he was calling to ask her questions because she couldn't hear in her office with the door shut.
Q. Did you ever tell Ashley that she had to, "earn her door"?
A. No, sir.
Q. Did you ever say anything similar to that?
A. No, sir.
Q. Did you ever tell Ashley that she had no right to privacy?
A. No, sir.
Q. Did you ever say anything similar to that?
A. No, sir.
Q. Do you recall when her door was reinstalled?
A. It had been a while.
Q. Approximately seven months, eight months, later?
A. Yeah. Yeah. Because I had forgot about it. It was sitting behind Stuart's desk. Why is your door not locked on? So we put it on.
Q. And Stuart's desk was in -- the way the trailer is set up, there's a common area in the middle of the trailer. And was your office on the left side, am I correct, when you



walk in?
A. Yes, sir.
Q. Okay.
A. Far-left end.
Q. And Ms. Lake's office was on the far-right side of the trailer, right?
A. Immediately when you walked in on the right.
Q. Okay.
A. Yes, sir.
Q. And then, the common area is right when you walk in the trailer, correct?
A. Yes, sir.
Q. And that's where Stuart's desk was --
A. Yes, sir.
Q. -- correct? And the desk and the -- once the -- Ms. Lake's door was taken off, it was placed behind that desk in the common area, correct? And that's where it stayed for seven or eight months?
A. Yes, sir.
Q. Okay.
A. Until Stuart was gone and we put it back on.
Q. Okay. And do you recall who physically reinstalled the door?
A. I did.
Q. Okay. Anybody help you?

A. No, sir.
Q. You deleted nothing, no communications about or with Ms. Lake?
A. Right. Deleted nothing.
Q. Have you -- have you ever, on your work phone, communicated with any other person regarding Ms. Lake's performance?
A. On my work phone?
Q. Yes.
A. Yes, sir.
Q. Okay. Who would you have communicated with about her performance on your work phone?
A. Brian.
Q. Brian Lux?
A. Yes, sir.
Q. Okay. And would you have communicated via text message with Mr. Lux about her work performance?
A. Or verbal. Text and verbal.
Q. Text and verbal?
A. Yes.
MR. SUMNER: Okay. I -- I think I'm getting close to finishing up. Can we go off the record for two minutes, just to make sure I've got everything covered?
THE WITNESS: Yes, sir.
MR. SUMNER: You guys want to take a quick



break?
THE WITNESS: Yes, sir.
MR. SUMNER: Let's go off the record.
THE REPORTER: We are off the record at 3:50 p.m.
(A recess was taken.)
THE REPORTER: We're back on the record at 4:00 p.m.
BY MR. SUMNER:
Q. Okay. I have a couple more questions for you, Mr. Cook. I appreciate -- appreciate your patience with me here. So let's go back to the allegation that Mr. Meadows made to you, or I guess the -- the statement that he made to you that he had been having sexual relations with -- with Ashley. He told you -- when he told you that he had sex twice with Ashley, am I correct that all three of you were employed at Taylor Morrison at the time?
A. Yes, sir.
Q. Okay. And at that time, was Mr. Meadows Ashley's boss?
A. Yes, sir.
Q. Okay. And are you aware of -- and he was going to meet with Mr. Lux to have this discussion with him about what had happened. Do you know whether he actually informed Mr. Lux that he had had sex with Ashley -- was having sex with Ashley?



A. That I don't know.
Q. Okay. Do you know whether -- did you or Stuart ever report his having sex with a subordinate to HR or to people services?
A. Speaking for myself, I never did.
Q. Okay.
A. I don't know if he ever did.
Q. Okay. And do you know whether Mr. Lux reported this?
A. I don't know.
MR. SUMNER: Okay. All right. I will pass the witness.
MS. LEONARD: Okay. I have one or two things here.

CROSS-EXAMINATION

BY MS. LEONARD:
Q. I believe when Mr. Sumner was asking you questions that he had asked whether anybody else in the workplace had made any comments with respect to Ms. Lake's breast. Do you remember that?
A. Yeah.
Q. And I believe you responded that Stuart had; is that correct?
A. Yes, ma'am.
Q. And what did Stuart say about Ms. Lake's breasts?
A. That she has nice breasts.



Q. Okay. And what did she say in response to that, if anything?
A. Well, her -- I mean, he always asked to see her breasts. He said they were nice breasts. She would respond back with, you know, joking manner of, well, you've seen them before, or, you know, you should know you've seen them. It was kind of the -- the banter between them back.
Q. I know you mentioned a couple of times today that you're not great with dates. I want to ask you about a specific meeting that you testified about in May -- say on May 30th, a call with Brian Lux and Ashley Soso. Do you remember testifying about that?
A. I do remember that.
Q. And I think you said that that -- in that call that that was the first time you had really seen the PIP. Do you recall saying that?
A. Yes, ma'am.
Q. Is that accurate?
A. That time frame, it would have been.
Q. Okay. When -- when would you have had conversations around the -- around Ms. Lake's PIP?
A. That would have been back in April.
Q. Okay.
A. But that would have gotten kicked off.
Q. Okay. And what conversations do you recall having

CHANGES AND SIGNATURE

WITNESS NAME: PHILLIP COOK
DATE OF DEPOSITION: August 13, 2026

PAGE LINE CHANGE REASON

______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________



I, PHILLIP COOK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________
PHILLIP COOK

THE STATE OF __________)
COUNTY OF _____________)

Before me, __________________________, on this day personally appeared PHILLIP COOK, known to me (or proved to me under oath or through ___________________) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of _______________________, __________.

NOTARY PUBLIC IN AND FOR
THE STATE OF ________________



NO. 4:25-CV-00996-ALM

ASHLEY LAKE, )
)
Plaintiff )
)
VS. ) CIVIL ACTION NO:
) 4:25-cv-00996-alm
TAYLOR MORRISON, INC., )
)
Defendant )

REPORTER'S CERTIFICATION
DEPOSITION OF PHILLIP COOK
August 13, 2026

I, Jeffrey Alan Payne, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PHILLIP COOK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on August 14, 2026 to the witness or to the attorney for the witness for examination, signature and return to me by September 4, 2026;

That the amount of time used by each party at the deposition is as follows:

Mr. Justin V. Sumner .....05 HOURS:06 MIN
Ms. Erika L. Leonard .....00 HOURS:04 MIN

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:



Mr. Justin V. Sumner, Attorney for Plaintiff;
Ms. Erika L. Leonard, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 14th day of August, 2026.

Jeffrey Alan Payne, CSR #13382
My Commission Expires: 05/31/2028
Victory Court Reporting, Inc.
Firm Registration #11074
Expiration Date: 10/31/2026
2641 Heatherwood Drive
Dallas, Texas 75228
Telephone Number: 214-324-3733